**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:

THOMAS GORMALLY

Debtor.

------------------------------------------------------------------x
SUZANNE O'HEARN, ELISE CHIN and JAMES
SINATRO, as Executors of the Estate
of Frances Sinatro,

Plaintiffs,

v.

THOMAS GORMALLY,

Defendant.

------------------------------------------------------------------x

Case No. 13-22109 (RDD)

Chapter 7

Adv. No. 13-08212 (SHL)

## POST-TRIAL MEMORANDUM OF DECISION

**A P P E A R A N C E S:**

**SUSSMAN & WATKINS**
*Counsel for the Plaintiffs*
145 Main Street, 2nd Floor
Ossining, New York 10562
  By:   Michael A. Deem, Esq.

**STEVEN D. HAMBURG, ESQ.**
*Counsel for the Defendant*
111 Great Neck Road, Suite 206
Great Neck, New York 11021
  By:   Steven D. Hamburg, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits after trial of the above-captioned adversary proceeding commenced by Suzanne O'Hearn, Elise Chin, and James Sinatro, as executors of the estate of Frances Sinatro (collectively, the "Plaintiffs") against Chapter 7 debtor Thomas Gormally (the "Debtor" or the "Defendant").  The Plaintiffs contend that the Defendant breached a contract with them to buy a piece of real property.  The Plaintiffs also claim intentional interference with prospective economic advantage based on a lis pendens filed by the Defendant preventing the Plaintiffs from selling the same property to a different party.  The Plaintiffs further allege that the Defendant made misrepresentations during and after the contract negotiations between the parties.  The Plaintiffs seek damages for these three claims, as well as a finding that the Defendant is not entitled to a bankruptcy discharge of his debts under Sections 727(a)(3) and 727(a)(4) of the Bankruptcy Code.

For the reasons set forth below, the Court finds that the Defendant intentionally interfered with the Plaintiffs' prospective economic advantage, but rejects the Plaintiffs' two other claims. The Court awards $60,000 to the Plaintiffs.  Finally, the Court finds that the Defendant is not entitled to a discharge under Section 727(a)(3) and Section 727(a)(4) of the Bankruptcy Code. This memorandum constitutes the Court's findings of fact and conclusions of law.[1]

---

[1]      Both the Plaintiffs and the Defendant have consented to this Court entering final orders and a judgment in this adversary proceeding.  *See* Joint Pretrial Order at 2 [Adv. No. 13-08212, ECF No. 26]; *see also Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015) ("Article III permits bankruptcy courts to decide *Stern* claims submitted to them on consent.").

# BACKGROUND

## A.  The Contract

On December 17, 2007, the Defendant made his initial offer to purchase 30 Durst Place,

Yonkers, New York ("30 Durst") for $400,000 from the estate of Frances Sinatro, for which the

Plaintiffs serve as executors.  (PX 1; PX 2).  The next day, he increased his offer to $435,000.

(PX 3).  On December 19, 2007, an individual who is not a party to this case—Maureen

Maloney—offered to purchase 30 Durst for the same amount.  (PX 4).  After additional offers by

Ms. Maloney and the Defendant (PX 42 at 007-008; PX 5), Ms. Maloney made a final offer of

$445,000, but informed the Plaintiffs' real estate counsel that she was unable to go any higher.

(PX 6).  The Defendant ultimately made the highest offer for the property at $475,000.  (PX 5;

PX 42 at 009).

The two parties then started negotiating the details of the contract.  On January 4, 2008,

Michael King, Esq., the Plaintiffs' real estate counsel, forwarded a Contract of Sale with a rider

("Version 1") to the Defendant's real estate counsel, Kathleen Bradshaw, Esq.  (PX 7).  It

provided for a purchase price of $475,000—all in cash with no mortgage contingency—and a

down payment in the amount of $47,500.[2]  (PX 7 at 002-003, 008).  Version 1 also included a

provision acknowledging the existence of other offers:

> The purchaser acknowledges that the seller has entered into this contract on the
> specific representations by the purchaser that this is an all cash deal and that the
> seller is rejecting other all cash offers that would have completed this transaction
> by February 5, 2008.

(PX 7 at 009).  Paragraph 4 of the contract rider provided for closing on February 5, 2008 (PX 7

at 008-009), and a $1,000 per day charge for every day closing was delayed.  (PX 7 at 009).  This

---

[2]      The Plaintiffs contend that the down payment in Version 1 was for $90,000 (Plaintiffs' Findings of Fact ¶
26).  Although the cover letter attached to Version 1 of the contract specified a down payment of $95,000 (PX 7 at
001), Version 1 itself indicated a down payment amount of $47,500.  (PX 7 at 002).

charge would continue until February 29, 2008, at which point the contract would expire by its

terms and the seller would refund the down payment, less $24,000 to compensate for "the lost

opportunity cost."  (PX 7 at 009).

By letter dated January 9, 2008, the buyer's attorney, Ms. Bradshaw, disagreed with

several terms in Version 1.  (PX 8).  Ms. Bradshaw complained that "while there is no mortgage

contingency, your forfeiture language is onerous, especially considering your client is an estate.

I have no problem with an on or about date, closing on or about February 15, 2007 [sic],

thereafter you can declare a time of the essence."  (PX 8).  After noting that she would not be

available to close between February 16 and February 24, 2008, she further complained that the

"$1000.00 per day penalty is excessive . . . and while there is no mortgage contingency we did

not agree to this penalty."  (PX 8).  Ms. Bradshaw stated that her client had "left the

downpayment and authorized me to send the contracts with these clauses redacted, I do not want

to just send the contract without discussing the changes first."  (PX 8).

Ms. Bradshaw and Mr. King spoke on January 14, 2008.  (PX 42 at 015).  Relying on

Mr. King's notes of the telephone conversation, the Plaintiffs assert that the following terms

were agreed to on that call: (1) the closing date was to remain February 5, 2008; (2) the penalty

amount was to be reduced to $300; (3) the penalty was to commence after February 15, 2008;

and (4) the down payment was to be reduced from 20% to 10%.  (Plaintiffs' Proposed Findings

of Fact ¶ 33).  The notes, however, are ambiguous as to what Ms. Bradshaw actually agreed to at

that time.  Mr. King's notes merely provide that "we wisht o [sic] close by 2/5/08 as recited to

Donna of her office – she can reduce the penalty of $300 and start it on 2/15 when we should

have closing so there will be no penalty."  (PX 42 at 015).  The notes further state that Mr. King

"told her to send Contract as it is to be revised with a letter stating her concerns and I will take it up with the 3 heirs."  (PX 42 at 015).

The next day after that call, Ms. Bradshaw's paralegal sent Mr. King a check in the amount of the $47,500 down payment and copies of the contract executed by the Defendant, with handwritten edits made by Ms. Bradshaw ("Version 2").  (PX 10).  Most of the contract terms in Version 2 remained unchanged from Version 1.  (PX 10).  But in Paragraph 4 to the contract rider, Ms. Bradshaw made significant handwritten edits reflecting that the parties still disagreed on some key terms:[3]

> <u>Mortgage Contingency</u>: Not applicable.  All Cash.  The purchaser acknowledges and represents to the seller that it has in hand funds sufficient to complete this transaction and that the purchaser can deliver at the closing  no later than February ~~5~~**15**, 2008 the balance of the purchase price by bank or certified checks.  In the event that the purchaser does not close and deliver the balance of the purchase price on February ~~5~~**29**, 2008,**\*** the purchaser agrees that the price will increase by $~~1,000.00~~**300** per day **for** ~~on February 5, 2008 and~~ every day ~~there~~after ~~until February 29, 2008~~ ~~when the contract will by its own terms expire~~.  The purchaser acknowledges that the seller has entered into this contract on the specific representations by the purchaser that this is an all cash deal and that the seller is rejecting other all cash offers that would have completed this transaction by February  ~~5~~**15**, 2008.  Accordingly, the purchaser acknowledges that if the closing is  delayed by the purchaser beyond February ~~5~~**29**, 2008, a charge of $~~1,000.00~~**300** a day  will be incurred ~~until February 29, 2008 when the contract will expire by it 's own terms and the seller will refund the purchasers downpayment less $24,000.00~~ to compensate for the lost opportunity cost ~~/ and the purchaser  will return the executed contracts and~~ **until** the contract **is** ~~will be~~ cancelled.
>
> **\*provided seller has cleared all title objections and can deliver property in accordance with this contract**

In sum, Ms. Bradshaw's edits reflected three main changes:[4] (1) a new closing date of February 15, 2008, (2) a penalty amount of $300 (reduced from $1,000) to be triggered on February 29,

---

[3]      Comparison of PX 10 at 008-009 with PX 7 at 008-009.  Deletions are indicated by strikethrough and handwritten additions by bolded and underlined text.

[4]      There were other changes reflected in Version 2 but these are not in dispute, and the Court therefore finds it unnecessary to address them.

2008 (changed from February 5, 2015), and (3) deleting the provision for forfeiture of $24,000 of the down payment.  (PX 10 at 008-009).

On January 18, 2008, Mr. King deposited the down payment check and told Ms. Bradshaw that he would forward the revised contract to his clients for review and approval.  (PX 11; PX 12).  Ms. Bradshaw subsequently emailed Mr. King that "we are not ready to schedule for 2/5 [closing] I will call you as soon as I am ready to schedule."  (PX 14).

Rather than agree to all Ms. Bradshaw's changes, Mr. King provided Ms. Bradshaw on January 30, 3008, with a new version of the contract executed by the Plaintiffs ("Version 3").  (PX 16).  In a cover letter, Mr. King stated that "we can close on the original proposed closing date of February 5, 2008 which, I believe, you altered to the 15th so as to avoid the penalty provision and to insure that the sellers had cleared all title objections."  (PX 16 at 001).  Version 3 of the Contract included handwritten notes by Mr. King next to Ms. Bradshaw's revisions to the closing date, penalty start date and forfeiture provisions, stating that "these changes were not made after being discussed and agreed and *are rejected*."  (PX 16 at 010; Trial Tr. 78:13-15, 79:7-10, 137:24-138:6, Dec. 3, 2014) (emphasis added).  Mr. King also made handwritten edits changing the closing date back to February 5, 2008, and the penalty start date to February 15, 2008.  (PX 16 at 010).  The penalty amount, however, remained $300.00, the amount suggested by Ms. Bradshaw in Version 2.  (PX 10 at 009; PX 16 at 010).  On the same day that he sent Version 3, Mr. King emailed Ms. Bradshaw and asked her to "please call me to discuss the closing in our office on February 5, 2008. . . ."  (PX 17).

The next day, Mr. King acknowledged Ms. Bradshaw's January 29th email, which had advised that Mr. Gormally was not prepared to close on February 5th; Mr. King said that he would let his clients know that the Defendant was adjourning the closing.  (PX 19).  On February

6

8, 2008, Mr. King sent a letter to Ms. Bradshaw with another copy of Version 3 executed by the

Plaintiffs.  (PX 22 at 001).  This letter restated Mr. King's position on the contract terms, which

remained unchanged since Version 3 and included his rejection of Ms. Bradshaw's strike outs in

paragraph 4.  (PX 22 at 001).  Mr. King further wrote that "although we called your office on

several occasions this week and last requesting an adjourned closing date[,] we have not had the

opportunity to speak with you" and noted that Mr. Gormally had not contacted anyone to

schedule a walk-through inspection as contemplated by an earlier email.  (PX 22 at 001-002; *see*

PX 21).

On February 13, 2008, Mr. King followed up again with Ms. Bradshaw.  (PX 23).  That

day, Ms. Bradshaw sent Mr. King a fax asserting that she had not received Version 3 of the

contract from him until February 8th, at which point the closing date that Mr. King inserted in

Version 3 had already passed.  (PX 24).  She stated that "[y]ou did not discuss with me the

changes so therefore there was no meeting of the minds and I demand that you sen[d] back to me

my clients downpayment."  (PX 24).  Mr. King subsequently responded that Version 3 of the

Contract was "revised in accordance with our telephone conversation, during which we agreed

that the proposed closing date would be February 5, 2008, but that the penalty phase would not

begin until February 15, 2008. . . ."  (PX 26).  He requested that Ms. Bradshaw advise him if Mr.

Gormally would complete the sale or if he was "seeking to avoid the transaction, in which case

the Contract will be enforced according to its agreed-upon terms."  (PX 26 at 002).

On March 7, 2008, Mr. King told Ms. Bradshaw that the Defendant was in default

because he had failed to tender the purchase price by the date set forth in the contract, and that

the Plaintiffs intended to exercise their remedies, which might include retaining the down

payment as damages.  (PX 27 at 002).  Ms. Bradshaw disagreed, claiming that the Defendant was

entitled to the return of the down payment.  (PX 28).  But the sellers stood firm.  (PX 29).

### B.  The State Court Proceedings

Ms. Bradshaw subsequently commenced an action for the Defendant against the Plaintiffs

in the Supreme Court of the State of New York, Westchester County, Index No. 19936/08 (the

"Westchester Case").  (PX 34).  She also filed a Notice of Pendency of Action, dated August 14,

2008 (the "Lis Pendens") for 30 Durst on behalf of the Defendant in the Westchester Case.  (PX

33).  The Lis Pendens stated that Mr. Gormally had a purchaser's lien on 30 Durst "under

contract of sale."  (PX 33 at 001).  But the Defendant's complaint (the "Westchester Complaint")

claimed he had no contract with the Plaintiffs because Mr. King did not transmit Version 3 of the

contract until February 8, 2008, and that the transmitted version included changes on essential

terms that "were never authorized or agreed to by the [Defendant] or [the Defendant's] attorney."

(PX 34 at 002-003).

In early 2009, the party previously interested in buying the property, Ms. Maloney, asked

Mr. King if "30 Durst is still available for sale or will it become available for sale sometime

soon?"  (PX 44 at 002) (asking if there was "a chance that we could make a deal.").  The

Plaintiffs assert that they could not entertain offers on 30 Durst as a result of the Lis Pendens,

without which they would have sold the property to Ms. Maloney.  (Plaintiffs' Proposed

Findings of Fact ¶¶ 107-08).

Mr. Gormally's claims in state court were eventually resolved.  The Lis Pendens was

cancelled by order of the New York State Supreme Court on August 10, 2009.  (PX 45).  The

parties subsequently reached a settlement on the disputed down payment, with half of the down

payment being returned to Mr. Gormally.  (PX 38).  But the Plaintiffs filed a complaint in the

Supreme Court of the State of New York, Kings County against Mr. Gormally and Ms.

Bradshaw on September 12, 2011, which was subsequently stayed when Mr. Gormally filed his

Chapter 7 bankruptcy.  (PX 120; PX 70).  Rather than returning to state court to litigate this

action, the Plaintiffs filed a claim in this bankruptcy [Case No. 13-22109, Claim No. 1], and the

parties agreed that this Court should resolve the Plaintiffs' claim in this adversary proceeding.

*See supra* note 1.

### C.  The Defendant's Bankruptcy Proceeding

On January 28, 2013, the Defendant filed a voluntary petition for relief under Chapter 7

of the Bankruptcy Code.  (PX 70).  At the same time, the Defendant filed Schedule A of his

Schedules of Assets and Liabilities, which listed his ownership of two pieces of real property

located in Yonkers, New York.  (PX 70 at 006).  About two weeks later, the Defendant filed his

Statement of Financial Affairs, listing his involvement in two New York businesses: CMG

Builders LLC and Vesey Renovations, Inc.  (PX 70 at 037).  On the same day, the Defendant

also filed Schedule B of his Schedules of Assets and Liabilities stating that he held no stock or

interests in incorporated or unincorporated businesses.  (PX 70 at 020, Line 13).  The Defendant

subsequently amended Schedule B to indicate that he held 50% interests in two Irish companies

known as Ballagh Properties and Gormally Investments.  (PX 70 at 053, Line 13).  But the

amended Schedule B listed the value of his interest in these two companies at zero.  (PX 70 at

053, Line 13).

Less than a week after the amended Schedule B was filed, the Chapter 7 Trustee in the

Defendant's bankruptcy case held a meeting of creditors under Section 341 of the Bankruptcy

Code (the "341 Meeting"). (PX 80).[5] During the 341 Meeting, the Defendant disclosed for the

first time that he owned interests in three real properties in a town called Tuam in Galway,

Ireland. (PX 80).[6] The Trustee directed the Defendant to provide her with extensive follow-up

documentation and information regarding the assets and interests that he had identified in the 341

Meeting. (PX 80 at 14:9-16, 19:5-15).

## DISCUSSION

### A. The Underlying Claims

#### 1. Breach of Contract

The parties disagree on whether they had a meeting of the minds on contract terms for the

sale of 30 Durst. In determining whether the parties entered into a contract, courts in New York

look to the basic elements of contracts: "an offer, acceptance of the offer, consideration, mutual

assent, and an intent to be bound." *Kowalchuck v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div. 1st

Dep't 2009) (citing 22 N.Y. Jur. 2d, Contracts § 9). "An acceptance of an offer must be

unequivocal and unambiguous with such factors depending not on the subjective undisclosed

intent of the offeree but upon the offeree's words and actions viewed from the perspective of a

---

[5]      The Plaintiffs originally submitted an audio recording of the 341 Meeting as an exhibit, but subsequently provided a written transcript of the recording. All references to PX 80 are to this transcript.

[6]      At the 341 Meeting, the Defendant testified that, through Ballagh Properties, he held an interest in a commercial property located in Tuam, Galway, Ireland, which had a store and apartments. (PX 80 at 9:13-11:20). The Defendant testified that he received rental income from this property, but that it "doesn't pay for itself." (*Id.* at 11:21-24). He testified that there were three tenants in this property—including one commercial tenant called Xtra-Vision—but that he was unaware of what these tenants paid in rent. (*Id.* at 14:17-15:8). He also stated that there was a mortgage on the property which he was not current on and that his brother managed the property. (*Id.* at 12:1-14, 13:12-18).

         The Defendant next testified that he owned a property called The Square Inn in Tuam, Galway, Ireland, also managed by his brother, which was run as a bar and had at one time been leased out. (*Id.* at 18:13-19:4). It subsequently came to light at trial that Mr. Gormally held his interest in The Square Inn through Gormally Investments. (Trial Tr. 277:9-16, Jan. 16, 2015). The Defendant also testified at the 341 Meeting that he owned a house located on Burlingham Road in Tuam, Galway, Ireland, in which no one lived and for which the mortgage was "in distress." (PX 80 at 16:18-18:5). Additionally, the Defendant stated at the 341 Meeting that there was a company bank account in Ireland and that he was not a signatory on the account, though his brother was. (*Id.* at 13:19-14:3).

reasonable person."  28 N.Y. Prac., Contract Law § 2:7 (citing *Int'l Bus. Machs. Corp. v. Johnson*, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009)); *see also King v. King*, 617 N.Y.S.2d 593, 593 (App. Div. 3d Dep't 1994) ("As a general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal.") (internal citations omitted).  "If . . . the offeree responds [to an offer] by conditioning acceptance on new or modified terms, that response constitutes both a rejection and a counteroffer which extinguishes the initial offer."  *Thor Props., LLC v. Willspring Holdings, LLC*, 988 N.Y.S.2d 47, 49 (App. Div. 1st Dep't 2014).

However, "'expressions of assent by an offeree, which contain immaterial deviations from the original offer, do not constitute counter-offers but, rather, operate to bind the parties to an enforceable contract.'"  *In re Randall's Island Family Gold Cntrs., Inc.*, 261 B.R. 96, 100 (Bankr. S.D.N.Y. 2001) (quoting *Knapp v. McFarland*, 344 F. Supp. 601, 613 (S.D.N.Y. 1971)); *see also Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) ("If the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer.'" (quoting *Valashinas v. Koniuto*, 125 N.Y.S.2d 554, 558 (App. Div. 3d Dep't 1953))); *Arnold v. Gramercy Co.*, 218 N.Y.S.2d 23, 25 (Sup. Ct. N.Y. Cty. 1961) ("Frequently an offeree, while making a positive acceptance of an offer, makes a request or suggestion that some addition or modification be made.  So long as it is clear that the meaning of the acceptance is positively and unequivocally to accept the offer, whether such request is granted or not, a contract is formed.").

"The mere fact that an offeree requests that certain changes be made in the contract is not, standing alone, fatal to the offeree's purported acceptance.  Indeed, 'a request for a

11

modification of the offer coupled with an otherwise unqualified acceptance, which does not depend on the offeror's assent to the requested change, operates as an acceptance and a contract is thereby formed.'" *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) (quoting *King*, 617 N.Y.S.2d at 594).  Because there must be mutual assent (i.e., meeting of the minds) to the essential terms and conditions, a contract is unenforceable unless it is reasonably definite and certain as to essential and material terms.  91 N.Y. Jur. 2d, Real Property Sales and Exchanges § 8 (citing *Del Pozo v. Impressive Homes, Inc.*, 945 N.Y.S.2d 368 (App. Div. 2d Dep't 2012)); *see also Kowalchuck*, 873 N.Y.S.2d at 46 (The "meeting of the minds must include agreement on all essential terms.") (internal citations and quotations omitted).  In assessing the difference between agreement and counteroffer, courts look to whether additional proposed terms are material.  *See Thor Props.*, 988 N.Y.S.2d at 49 (by modifying a material term of counteroffer, the party rejected it and proposed a counteroffer).

Based on the weight of the evidence, the Court finds there was no meeting of the minds to contract.  As an initial matter, the Court rejects the Plaintiffs' contention that the Defendant unequivocally and unambiguously accepted the Plaintiffs' offer in Version 1 of the contract. (*See* Plaintiffs' Proposed Conclusions of Law at 39).  In response to receiving Version 1, the Defendant's counsel sent a letter that requested certain changes be made to the rider.  (PX 8). The letter also included the reservation that the Defendant had "left the downpayment and authorized me to send the contracts *with these clauses redacted*. . . ."  (PX 8) (emphasis added). The clauses being debated—including most notably a forfeiture provision as to $24,000 of the down payment and a daily penalty amount with the penalty start date—were sufficiently material to preclude contract formation.  (PX 8).

Relying on a January 14, 2008 telephone call between Mr. King and Ms. Bradshaw, the Plaintiffs argue that the parties' disagreements over material terms were resolved and thus a contract was formed. (*See* Plaintiffs' Proposed Conclusions of Law at 39). But the only contemporaneous evidence of this call—business notes taken by Mr. King—suggests that important issues were left open. Indeed, the notes reflect that the parties merely agreed to continue negotiating, and that Ms. Bradshaw would be providing a revised version of the contract reflecting her concerns. (PX 42 at 015). For example, Mr. King's notes reflect that he told Ms. Bradshaw "to send [the] Contract as it is to be revised with a letter stating her concerns and I will take it up with the 3 heirs." (PX 42 at 015). Moreover, Mr. King's notes do not reflect an agreement on all material terms. Most significantly, the notes do not address Ms. Bradshaw's complaint that the "forfeiture language is onerous," meaning that the parties had no agreement about whether $24,000 of the down payment might be forfeited. (PX 8). The Plaintiffs' reliance on this telephone call is flawed for another reason: under the statute of frauds, a contract for the sale of real property "is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith. . . ." N.Y. Gen. Oblig. Law § 5-703[3].

Events after these notes only further weaken the Plaintiffs' position. One day after the January 14th call, Version 2 of the contract was delivered to Mr. King from Ms. Bradshaw. Rather than adopting the Plaintiffs' terms, Ms. Bradshaw made handwritten edits to the rider that changed the closing date, the penalty amount and trigger date, and deleted the forfeiture clause. (PX 10 at 009). *See, e.g., Woodward v. Tan Holding Corp.*, 820 N.Y.S.2d 126, 128-29 (App. Div. 2d Dep't 2006) ("[A] binding and enforceable contract was not created . . . when the plaintiff signed the second rider. Prior to signing the second rider, the plaintiff unilaterally

modified one of its material terms. . . . The plaintiff's modification of the second rider

constituted a counteroffer which the defendant never expressly accepted, and indeed was entitled

to refuse by ignoring it.").  In the same vein, Mr. King's subsequent letter of January 18th

reflects that the parties were still negotiating: "As we discussed on the telephone, my clients

would entertain revisions to the Contract which I see you have annotated on the Contract and

Rider.  I am sending the Contract and Rider to my clients for review and approval.  I . . . will not

be back in the office until Wednesday, January 23, 2008, at which time I will have received input

from my clients as to the changes."  (PX 12 at 001).  These changes, which included the

Defendant's deletion of the forfeiture provision as to $24,000, were subsequently explicitly

rejected by the Plaintiffs' counsel.  (PX 16 at 010).

Finally, the Court rejects the Plaintiffs' argument that the changes made to Version 2—

and subsequently rejected in Version 3—were immaterial.  (*See* Plaintiffs' Proposed Conclusions

of Law at 39).  As between these two versions, the evidence demonstrates that the parties

continued to disagree on three significant contract terms: (1) the deletion of the forfeiture clause

for the down payment, (2) the penalty start date, and (3) the closing date.  As to the forfeiture

clause, Ms. Bradshaw in Version 2 eliminated the Plaintiffs' proposed contract expiration date of

February 29, 2008 and the related forfeiture provision for $24,000.00.  In Version 3, Mr. King

reinstated this clause.  Given its significant monetary exposure to the Defendant, a disagreement

over this forfeiture clause was material and prevented contract formation.

As to the penalty start date, the contract rider provided that if "the purchaser does not

close and deliver the balance of the purchase price" by the penalty date, then the "the purchaser

agrees that the price will increase by" a set amount per day.  (PX 10 at 009).  As the contract

characterizes this penalty as an increase in the price of the property, it is an essential element of

the contract. *See Pino v. Harnischfeger*, 840 N.Y.S.2d 504, 508 (App. Div. 4th Dep't 2007)

("The price and terms of payment are essential elements of a contract for the sale of real

property."). Thus, the failure to determine the date that the increase in price would begin—and

how long it would last—is tantamount to a failure to agree on the ultimate price and therefore a

failure to agree on an essential term of the contract.[7]  Going back to Version 1 of the contract, the

Plaintiffs assert that neither Mr. Gormally nor Ms. Bradshaw ever raised an objection regarding

the penalty start date of February 5, 2008.  (Plaintiffs' Proposed Conclusions of Law at 39; PX 7

at 009).  But the Plaintiffs are wrong.  Ms. Bradshaw explicitly rejected a closing date of

February 5, 2008.  (PX 8) (Ms. Bradshaw stating that "I have no problem with an on or about

date, closing on or about February 15, 2007 [sic], thereafter you can declare a time of the

essence.").  She further noted that she would not be available to close between February 16 and

February 24, 2008.  (PX 8).  Her lack of agreement is reinforced by her changes in Version 2 of

the contract, which proposed a penalty start date of February 29, 2008.  (PX 10 at 009).  As the

disputed penalty start date—together with the disputed forfeiture clause—potentially involved

close to $30,000, it is impossible to conclude that there was a meeting of the minds.

As to the closing date, the evidence also demonstrates that the parties never reached an

agreement.  If the only difference between the parties was to the closing date itself, the Plaintiffs

might be right about contract formation because the contract did not provide that time was of the

essence. *See Safier v. Kassler*, 508 N.Y.S.2d 352, 354 (App. Div. 3d Dep't 1986) ("The date of

closing of a real estate transaction is not generally considered an essential element to establish an

enforceable contract.  The law presumes it will take place within a reasonable time" unless time

---

[7]      Using the $300 penalty per day figure, the Defendant's failure to close between February 15th and
February 29th would add another $4,200 to the contract price.

is of the essence.) (internal citations omitted).  But as it was merely one of several items, the

difference on it only confirms the parties' lack of agreement.  *See O'Brien v. West*, 605 N.Y.S.2d

366, 368 (App. Div. 2d Dep't 1993) (in statute of frauds analysis, stating that "the memorandum

made no mention of a closing date, the quality of title to be conveyed, adjustments for real estate

and/or sales taxes paid by the sellers, or the risk of loss during the sale period.  While the

omission of any of these terms, standing alone, may not have constituted a fatal omission . . . the

omission of so many material terms from the instant agreement underscores the conclusion that it

was not intended to be a complete contract containing all essential terms.") (internal citations and

quotations omitted); *Nesbitt v. Penalver*, 835 N.Y.S.2d 426, 429 (App. Div. 2d Dep't 2007).[8]

### 2.  *Intentional Interference with Prospective Economic Advantage*

The Court next turns to the Plaintiffs' claim that the Defendant's Lis Pendens wrongfully

prevented the sale of 30 Durst to another party.  To successfully establish a claim for the tort of

intentional interference with prospective economic advantage, the Plaintiffs must prove: "(1)

[they] had a reasonable expectation of entering into a valid business relationship; (2) the

defendant's knowledge of the expectation; (3) purposeful interference by the defendant that

prevents the [plaintiffs'] legitimate expectancy from ripening into a valid business relationship;

and (4) damage to the plaintiff resulting from the defendant's interference."  *Aon Risk Servs. v.

Cusack*, 2011 N.Y. Misc. LEXIS 6392, at *56 (Sup. Ct. N.Y. Cty. 2011).  Essential to prevailing

on this claim "is that the complaining party would have consummated a contract *but for* the

interference of a third party."  *Brown v. Bethlehem Terrace Assocs.*, 525 N.Y.S.2d 978, 980

(App. Div. 3d Dep't 1988) (emphasis in original).  "A cause of action has . . . been recognized

where a party would have received a contract but for the malicious, fraudulent, and deceitful acts

---

[8]    The Plaintiffs raise several arguments in support of a February 5, 2008 closing date.  While the Plaintiffs'
arguments misread the factual record, the Court does not need to resolve that issue given its other rulings.

13-08212-shl   Doc 32   Filed 04/05/16   Entered 04/05/16 11:39:18   Main Document
Pg 17 of 45

of a third party, such, for instance, as materially lying about him." *Williams & Co. v. Collins, Tuttle & Co.*, 176 N.Y.S.2d 99, 103 (App. Div. 1st Dep't 1958) (internal citations and quotations omitted).

The Court concludes that the Plaintiffs have satisfied their burden in proving each of the four elements of this claim.  First, the Plaintiffs have established that they had a reasonable expectation of entering into a business relationship with Ms. Maloney.  Ms. Maloney made at least three offers for 30 Durst before the Defendant's offer was accepted.  (PX 4; PX 42 at 007-008; PX 6).  She also inquired into the status of the property over a year later, demonstrating her continuing desire to buy 30 Durst from the Plaintiffs.  (PX 44 at 002).  The Defendant argues that it is "speculative at best" that Ms. Maloney would have purchased the property (Defendant's Proposed Conclusions of Law ¶ 30), and that Ms. Maloney no longer wished to do business with the Plaintiffs because they rejected her amendments to the original rider in a proposed sale contract.  (Trial Tr. 22:7-16, Dec. 3, 2014).  But the evidence contradicts these arguments.  It is simply not true that the Plaintiffs "only went to Mr. Gormally after . . . the proposed deal with Ms. Maloney fell through."  (Trial Tr. 23:4-6, Dec. 3, 2014).  In fact, Ms. Maloney contacted Mr. King on December 27, 2007, saying that "she was wrapped up with Christmas and didn't know what her attorney was doing; [she] wants to proceed [without the] Rider."  (PX 42 at 006).  Notably, Ms. Maloney made her second and third offers for 30 Durst after this conversation. (PX 42 at 007-008) (on December 28, 2007, reflecting offer of $440,000); (PX 6) (reflecting that by January 3, 2008, offer was subsequently increased to $445,000).  Not surprisingly then, Mr. King discussed the pros and cons of Ms. Maloney's offer on December 28, 2007 with his client, including the "certainty of a deal with [Ms. Maloney] who now will not object to the Contract."  (PX 42 at 007).  Such contemporaneous evidence demonstrates the reasonable expectation of a

deal between these parties, a conclusion confirmed by Ms. Maloney's continued interest in the property in 2009.[9]

Second, the evidence establishes that the Defendant had knowledge that the Plaintiffs would have sold 30 Durst to Ms. Maloney but for the Defendant's interference. Every version of the contract included language indicating that "[t]he purchaser acknowledges that the seller has entered into this contract on the specific representations by the purchaser that this is an all cash deal and that the seller is rejecting other all cash offers. . . ." (PX 7 at 009; PX 10 at 009; PX 16 at 010). Moreover, the Defendant made multiple offers on 30 Durst in response to Ms. Maloney's offers. And as discussed below, the Defendant clearly filed the Lis Pendens to prevent the Plaintiffs from selling 30 Durst to any other party until the Defendant's litigation was concluded or the Lis Pendens was lifted.

Third, the Court finds that the Defendant's filing of the Lis Pendens purposefully interfered with the Plaintiffs' ability to enter into a contractual relationship for the sale of 30 Durst. In the case of *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004), the New York Court of Appeals addressed the level of conduct necessary to make a claim for interference with prospective economic relations. The *Carvel* court first observed that where there is an existing contract, a plaintiff may recover damages for inducing a breach even if the defendant engaged in lawful behavior. *Carvel*, 3 N.Y.3d at 189-90 (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (1996)). Where no such contract exists, however, a plaintiff must prove "more culpable conduct on the part of the defendant." *Id.* at 190 (quoting *NBT Bancorp*, 87 N.Y.2d at 621). Thus, "as a general rule, the defendant's conduct must amount to a crime or

---

[9]    The Court is mindful that there were fluctuations in the real estate market during this time period. But the Defendant did not introduce any evidence or make any argument on that issue. In any event, concerns over such fluctuations are lessened given Ms. Maloney's undisputed interest in the property in 2009.

an independent tort." *Id.* Exceptions to this general rule exist, however, one being where "a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (internal citations and quotations omitted); *see also Sommer v. Kaufman*, 399 N.Y.S.2d 7, 8 (App. Div. 1st Dep't 1977) (under the theory of prima facie tort, a plaintiff has a claim of intentional interference with prospective economic advantage "if lawful means are used but the interference is the infliction of intentional harm, resulting in damage, and done without excuse or justification.").

The *Carvel* court noted that two of its prior cases had elaborated on the types of "more culpable" conduct sufficient to make a successful claim. Specifically, a party "will not be liable so long as 'the means employed are not wrongful.'" *Carvel*, 3 N.Y.3d at 191 (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)); *see also GS Plasticos Limitada v. Bureau Veritas*, 931 N.Y.S.2d 567, 568 (App. Div. 1st Dep't 2011) (successful claims can be established when the interference was lawful but "accomplished by 'wrongful means' or that the defendant acted with the sole purpose of harming the plaintiff."). "Wrongful means" may include, among other things, misrepresentation, civil suits, and "some degrees of economic pressure." *Carvel*, 3 N.Y.3d at 191 (quoting *Guard-Life Corp.*, 50 N.Y.2d at 191); *see also Snyder v. Sony Music Entm't, Inc.*, 684 N.Y.S.2d 235, 300 (App. Div. 1st Dep't 1999). Actions taken purely for normal economic self-interest will not meet the level of conduct necessary to make a claim. *See, e.g., Carvel*, 3 N.Y.3d at 190; *NBT Bancorp Inc.*, 87 N.Y.2d at 625. Additionally, the conduct must be "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel*, 3 N.Y.3d at 192.

The Plaintiffs have satisfied the standard articulated in *Carvel*. "By registering a conflicting claim against the owner's title, the filing of a notice of pendency severely restricts, if

19

not undermines, the owner's power of conveyance since the owner can no longer convey an unencumbered title." *Hercules Chem. Co. v. VCI, Inc.*, 462 N.Y.S.2d 129, 132 (Sup. Ct. N.Y. Cty. 1983). When Ms. Maloney reached out to the Plaintiffs for the fourth and final time in 2009 to inquire about purchasing 30 Durst, the property was still subject to the Lis Pendens and the Plaintiffs were thus unable to enter into a contract with her. (PX 44).

The Court finds that the Defendant's interference was independently tortious. "[T]he use of a lis pendens in an action for specific performance is a proper legal device." *Chappelle v. Gross*, 274 N.Y.S.2d 555, 559 (App. Div. 1st Dep't 1966). But "where a person uses this process, not to effect its proper function, but to accomplish through it some collateral object to the detriment or damage of another, he perverts the process and commits the tort of malicious prosecution." *Id.* The Defendant did not file the Lis Pendens to compel the Plaintiffs to consummate a contract for the sale of 30 Durst to the Defendant but rather to force the Plaintiffs to return the Defendant's down payment. The Defendant did not even request specific performance in his state court lawsuit. Indeed, the Defendant's Lis Pendens and the Westchester Complaint are completely contradictory. In the Lis Pendens, the Defendant alleged that he had a purchaser's lien on 30 Durst under contract of sale, while the Westchester Complaint asserted that no contract was ever formed. (PX 33 at 001; PX 34 at 002-004). Not surprisingly then, the Defendant's trial counsel admitted that he would not have used a lis pendens in such circumstances. (Trial Tr. 24:23-25:2, Dec. 3, 2014).

For these same reasons, the Court finds that the Defendant's act of filing the Lis Pendens also constitutes wrongful means, through the use of civil proceedings to apply economic pressure. *See Carvel*, 3 N.Y.3d at 191 ("Wrongful means" includes, among other things, misrepresentation, civil suits, and "some degrees of economic pressure.") (quoting *Guard-Life*

20

*Corp.*, 50 N.Y.2d at 191); *see also Snyder*, 684 N.Y.S.2d at 300. "Generally, a notice of

pendency may be filed under CPLR § 6501, in any action in which the judgment demanded

'would affect the title to, or the possession, use or enjoyment of real property.'" *Ostad v.*

*Nehmadi*, 2011 N.Y. Misc. LEXIS 1535, at *6 (Sup. Ct. N.Y. Cty. Apr. 8, 2011) (quoting N.Y.

CPLR § 6501. "The basic test is whether the pleading on its face directly affects the necessary

interest in the land and notice of pendency is improper if the relationship of action to realty is

only indirect. Consequently, New York courts have confined the [use of a] notice of pendency to

cases in which the plaintiff claims a direct interest in the defendant's real property and actions

asserting an interest in personal property do not fall within the scope of CPLR § 6501." *Id.* at

*7-8; *see also 5303 Realty Corp. v. O & Y Equity Corp.*, 64 N.Y.2d 313, 321 (1984) ("The courts

have been frequently confronted by attempts to file a notice of pendency in controversies that

more or less referred to real property, but which did not necessarily seek to directly affect title to

or possession of the land. In the absence of this direct relationship, the remedy was denied.");

*5303 Realty Corp.*, 64 N.Y.2d at 319-20 (noting the "procedural ease" of filing a lis pendens,

through which a party "can cloud a defendant's title merely by serving a summons and filing a

proper complaint and notice of pendency stating the names of the parties, the object of the action,

and a description of the property. . . .Critically, the statutory scheme permits a party to

effectively retard the alienability of real property without any prior judicial review.") (internal

citations and quotations omitted).

In the Westchester Case, the Defendant sought only the return of his down payment and

he had already filed the action to accomplish this goal. (PX 34 at 004-005). He did not seek

specific performance or even claim any interest in the real property, arguing instead that no

contract existed between the parties. (PX 34 at 003-005). The filing of the Lis Pendens clearly

added nothing to the Defendant's objective of recovering his down payment and thus was not a

legitimate part of his pursuit of his economic self-interest.  As New York state courts have

recognized, "it is simply improper to use a notice of pendency as a form of attachment."  *5303

Realty Corp.*, 64 N.Y.2d at 324 (internal citations omitted).

To the extent that conduct must be directed at the party with which the Plaintiffs sought

to have a contractual relationship, *see Carvel*, 3 N.Y.3d at 192, the Lis Pendens also satisfies this

requirement.  Any interested party was effectively barred from purchasing 30 Durst because of

the Plaintiffs' inability to convey title.  Thus, all interested purchasers—including Ms.

Maloney—were subjected to economic pressure because they simply could not enter into a

contract with the Plaintiffs for 30 Durst during the time that the Lis Pendens was in effect.[10]

Fourth and finally, the Defendant's interference resulted in damages to the Plaintiffs.

The Plaintiffs rejected Ms. Maloney's offer of $445,000 for 30 Durst to accept the Defendant's

higher offer (PX 42 at 009) and were unable to entertain her subsequent inquiry into 30 Durst

while the Lis Pendens was in effect.  (PX 44).  After the Lis Pendens was eventually lifted the

following year, the Plaintiffs sold 30 Durst to another buyer for $385,000.  (PX 37).  The Court

therefore finds that the Plaintiffs suffered monetary loss due to the interference of the Defendant.

When a plaintiff prevails on a claim of intentional interference with prospective

economic advantage, "the measure of damages 'is the loss suffered by the plaintiff, including the

---

[10]   The Defendant argues that the Plaintiffs failed to establish their claim because they did not "demonstrate any existing contract that was in place that [the Defendant] could have interfered with."  (Defendant's Proposed Conclusions of Law ¶ 19).  This defense is misguided.  The Plaintiffs have asserted a claim of tortious interference with prospective economic advantage, not interference with contractual relations.  (Plaintiffs' Proposed Conclusions of Law at 37).  Unlike interference with contractual relations, a plaintiff need not establish an existing contract to prevail on a claim of tortious interference with prospective economic advantage.  *See, e.g.*, *Carvel*, 3 N.Y.3d at 189 ("[I]nducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but . . . the elements of the two torts are not the same.").  The Defendant also claims that the Lis Pendens did not prevent the Plaintiffs from entering into an agreement with Ms. Maloney.  (Defendants' Proposed Conclusions of Law ¶ 31).  But they offer no facts to support such a conclusion, which is a proposition inconsistent with New York law.

opportunities for profits on business diverted from it.'" *Mandelblatt v. Devon Stores, Inc.*, 521

N.Y.S.2d 672, 676 (App. Div. 1st Dep't 1987) (citing 32 N.Y. Jur., Interference § 40). The loss

to the Plaintiffs due to the Defendant's interference is the amount for which the Plaintiffs would

have sold 30 Durst to Ms. Maloney, $445,000, less the amount they sold it for once the Lis

Pendens was lifted, $385,000. (PX 42 at 009; PX 37 at 002) The Court therefore awards

damages to the Plaintiff in the amount of $60,000.00.[11]

### 3. Fraud

The Plaintiffs also assert a claim of fraud against the Defendant, for a variety of alleged

misrepresentations during and after the parties' negotiations.[12] Under New York law, "[t]he

elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge

of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) (internal citations

omitted). The burden rests on the party alleging fraud to set forth the necessary elements and to

plead with the requisite particularity under N.Y. CPLR § 3016(b), which requires the party to

---

[11]     The Court notes that the Defendant provided no evidence or argument on damages, arguing merely that there was no realistic possibility of a sale to Ms. Maloney. As the Court has rejected this argument, it relies upon the only evidence of damages presented in the case, which the Court concludes is credible evidence of the value of the property in another sale transaction and satisfies the Plaintiffs' burden of proof on the issue.

[12]     The Plaintiffs allege the Defendant made the following specific misrepresentations:

   1) stating that he had monies available to close on the contract and was a purchaser in good faith;
   2) stating that the parties did not have a meeting of the minds regarding the sale of 30 Durst;
   3) stating that Mr. King or the Plaintiffs made unilateral changes to the contract when in fact it was Mr. Gormally and his attorney that made unilateral changes;
   4) filing a complaint in Westchester County Supreme Court with fabricated allegations that Mr. King stated he would return the downpayment;
   5) stating to the Hon. Orazio Bellantoni, J.S.C., that Mr. King stated he would return the downpayment;
   6) filing a lis pendens sounding in contract and refusing to voluntarily remove it at the same time he filed a complaint seeking return of the downpayment due to no contract; and
   7) waiting to file the action and lis pendens in Westchester County until the real estate market hit the lowest point it had been to since the great depression.

(Plaintiffs' Proposed Conclusions of Law at 40-41).

enumerate "the circumstances constituting the wrong in detail sufficient to inform a defendant with respect to the incidents complained of." *Ressis v. Herman*, 505 N.Y.S.2d 266, 267 (App. Div. 3d Dep't 1986) (internal citations and quotations omitted).

"An essential element of any fraud claim is that there must be reasonable reliance, to a party's detriment, upon the representations made by the defendant against whom the fraud claimed has been asserted. . . . The plaintiff must show a belief in the truth of the representation and a change of position in reliance on that belief." *Nabatkhorian v Nabatkhorian*, 7 N.Y.S.3d 479, 481 (App. Div. 2d Dep't 2015) (internal citations and quotations omitted). "Reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud. . . . What constitutes reasonable reliance is always nettlesome because it is so fact-intensive." *VisionChina Media Inc. v. S'holder Representative Servs., LLC*, 967 N.Y.S.2d 338, 343-44 (App. Div. 1st Dep't 2013) (internal citations and quotations omitted).

The Plaintiffs have not shown that they justifiably relied on the vast majority of the alleged misrepresentations they cite to support their claim of fraud. These representations relate to the legal positions and the statements of the Defendant in the Lis Pendens and Westchester Case. *See supra* note 12. Even if such actions and statements were misrepresentations, the Plaintiffs cannot show they were made for the purpose of inducing the Plaintiffs' reliance or that the Plaintiffs changed their own position in reliance on them. For instance, one alleged misrepresentation was the Defendant's "filing a complaint in Westchester County Supreme Court with fabricated allegations that Mr. King stated he would return the downpayment." (Plaintiffs' Proposed Conclusions of Law at 40-41). But this clearly was not a statement made to the Plaintiffs to induce their reliance. *See, e.g., Deutsche Bank Nat'l Trust Co. v. Sinclair*, 891 N.Y.S.2d 445, 447-48 (App. Div. 2d Dep't 2009). Indeed, the Plaintiffs had their own first-hand

24

knowledge of the events involving Mr. King and the negotiation process, and therefore cannot

argue they justifiably relied on these statements by the Defendant in state court.  *See, e.g.,*

*Shaffer v. Gilberg*, 4 N.Y.S.3d 49, 52 (App. Div. 2d Dep't 2015) ("The plaintiff always

maintained that he knew the promissory notes and loans were fabricated and, thus, he failed to

allege the necessary elements of justifiable reliance on a material misrepresentation."); *see also*

*Hense v. Baxter*, 914 N.Y.S.2d 200, 203 (App. Div. 2d Dep't 2010).

Of the alleged misrepresentations cited by the Plaintiffs, there is only one that the

Plaintiffs and their counsel could have justifiably relied upon because they lacked first-hand

knowledge.  That alleged misrepresentation is that the Defendant had monies available to close

on the contract and was a purchaser in good faith.  But the Plaintiffs have failed to prove that this

was actually a misrepresentation.  Counsel to the Plaintiffs accepted and deposited a down

payment check in the amount of $47,500 from CMG Builders LLC, a corporation for which the

Defendant was the sole member.  (Trial Tr. 281:15-21, Jan. 16, 2015).  The evidence

demonstrates that the Defendant had additional sources of funds available to pay the balance of

the purchase price.  For example, a bank statement for CMG Builders reflected a balance of

$202,556.73 remaining after the down payment was cashed.  (PX 18).  Similarly, HP Capital had

given CMG Builders a loan commitment, dated January 14, 2008, in the amount of $375,000.00.

(PX 9).[13]

The Plaintiffs make much of the fact that this was to be an "all cash deal" with no

mortgage contingency.  But the all-cash deal requirement did not prevent Mr. Gormally from

---

[13]    While this commitment stated that it expired in ten days, it also provided that "[i]f the borrower does not
pursue a loan with Lender during such 10-day period, Lender has the right to revoke or renegotiate the terms set out
in this proposal."  (PX 9 at 002).  The Plaintiffs provide no proof that the commitment was ever revoked or
renegotiated.  It was not even clear that the ten day period had expired when Mr. Gormally signed Version 2, where
he represented that he had "in hand funds sufficient to complete this transaction and that the purchaser can deliver at
the closing . . . the balance of the purchase price by bank or certified checks. . . ."  (PX 10 at 008-009).

procuring money from other sources in advance and using that money to pay the Plaintiffs in

cash without a mortgage contingency.  In fact, Mr. King candidly testified at trial that it did not

matter where the funds came from, so long as they are provided as a bank or certified check by

the purchaser at closing.  (*See* Trial Tr. 141:18-142:13, Dec. 3, 2014); *see also Howard v.*

*Youngman*, 81 S.W.3d 101, 111 (Mo. Ct. App. 2002) ("If the buyer has the purchase price in

cash to pay the seller, it should not matter to the seller how that cash was obtained.").

Relying on *Rocanova v. Equitable Life Assurance Society*, 83 N.Y.2d 603 (1994), the

Plaintiffs seek treble damages against the Defendant for defrauding "the Court and the public at

large by publishing his false statements in public records by way of his complaint, lis pendens

and in open court."  (Plaintiffs' Proposed Conclusions of Law at 41).  But *Rocanova* does not

apply here.  That case involves claims that the defendant insurance company breached its

contract and committed insurance fraud against not only the plaintiff, but also its policy holders

at large.[14]  *Rocanova* specifically noted that the conduct alleged must be "aimed at the public

generally."  *Rocanova*, 83 N.Y.2d at 613.  "Thus, a private party seeking to recover punitive

damages must not only demonstrate egregious tortious conduct by which he or she was

aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the

public generally."  *Id*.  As the Plaintiffs have provided no evidence that the Defendant was

involved in a pattern of wrongdoing directed at the public, the Plaintiffs claim for punitive

damages must fail.[15]

---

[14]    Specifically, the plaintiff in *Rocanova* alleged a "10-year fraudulent pattern and practice of selling
insurance policies to the general public with the intention of not honoring the policies as written."  *Rocanova*, 83
N.Y.2d at 611.  The complaint in *Rocanova* referred "to 124 disputes between Equitable and other policyholders in
support of [the plaintiff's] assertion that Equitable systematically ignored claimholders, lied, invented artificial
disputes, filed groundless lawsuits, and otherwise wrongfully and deliberately evaded claims and withheld moneys,
all for the purpose of defrauding claimholders of interest on moneys withheld and extorting principal from
claimholders through fear and intimidation."  *Id*.

[15]    Punitive damages are not generally recoverable for an ordinary breach of contract as "their purpose is not to
remedy private wrongs but to vindicate public rights."  *Rocanova*, 83 N.Y.2d at 613 (citing *Garrity v. Lyle Stuart,*

### B.  The Bankruptcy Claims

With the Plaintiffs having established a claim for tortious interference with prospective economic advantage, the Court turns to whether that claim—and others in this bankruptcy—are dischargeable.  A central purpose of the Bankruptcy Code "is to allow the 'honest but unfortunate debtor' to begin a new life free from debt."  *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 234 (2d Cir. 2006).  For the protection of creditors, however, Section 727 of the Bankruptcy Code requires a denial of a discharge in certain circumstances.  *See id.* Because Section 727 "imposes an extreme penalty for wrongdoing[,]" the Second Circuit has held "that it must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'"  *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).  But even applying this deferential standard here, the Court finds that the Defendant's debts are not dischargeable under Sections 727(a)(3) and 727(a)(4) of the Bankruptcy Code.

### 1.  *The Defendant's debts are not dischargeable pursuant to Section 727(a)(3) of the Bankruptcy Code*

A court must deny a discharge pursuant to Section 727(a)(3) if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained," unless justified.  11 U.S.C. § 727(a)(3).  "The purpose and intent of [this section] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs."  *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936).  For a plaintiff

---

*Inc.*, 40 N.Y.2d 354, 358 (1976)).  The high standard for punitive damages requires that the alleged fraudulent conduct must evidence "'a high degree of moral turpitude' and demonstrat[e] 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"  *Rocanova*, 83 N.Y.2d at 613 (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 404-05 (1961)).  Such a showing has not been made here.

to successfully object to a discharge under Section 727(a)(3), the plaintiff must show that: "(1)
the debtor failed to keep or preserve books and records from which the debtor's financial
condition or business transactions might be ascertained, and (2) this failure makes it impossible
to determine the debtor's true financial condition." *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40,
51 (E.D.N.Y. 2010) (citing *In re Cacioli*, 463 F.3d at 235).  "[A]lthough [Section] 727(a)(3)
focuses on records relating to the debtor's personal financial affairs, his failure to keep adequate
financial records regarding the business transactions of a closely held corporation that are
necessary to determine his personal financial affairs may result in the denial of a discharge."
*Stillwater Liquidating LLC v. Gray (In re Gray)*, 2016 Bankr. LEXIS 804, at *9-10 (Bankr.
S.D.N.Y. Mar. 15, 2016) (citing *Beach Lane Mgmt., Inc. v. White (In re White)*, 2015 WL
9274771, at *3 (Bankr. S.D.N.Y. Dec. 18, 2015)) (collecting cases).

    The "impossibility element does not require that the creditors examine all records and
documents produced and prove that the debtor's financial condition cannot be ascertained from
those records." *Bronfman v. O'Hara (In re O'Hara)*, 2013 U.S. Dist. LEXIS 58167, at *22
(N.D.N.Y Apr. 23, 2013).  "Rather, the focus is on the documents that have not been provided by
the debtor and whether it would be unduly burdensome or impossible to ascertain the debtor's
financial condition or material business transactions without them. . . . Further, the debtor is the
gatekeeper of this information and the '[c]ourts and creditors should not be required to speculate
as to the financial history or condition of the debtor, nor should they be compelled to reconstruct
the debtor's affairs.'" *Id.* at *22-23 (quoting *In re Juzwiak*, 89 F.3d at 424, 427 (7th Cir. 1996)).

    Once the plaintiff has successfully established that the debtor has failed to maintain his or
her records, the burden shifts to the debtor to justify their absence.  *See In re Cacioli*, 463 F.3d at
235; *In re Sandow*, 151 F.2d 807, 809 (2d Cir. 1945) ("The statute puts the burden squarely upon

the bankrupt who produces no financial records to produce at least a satisfactory explanation of their absence."). "While the Bankruptcy Code does not define what constitutes justification for a failure to maintain records under [S]ection 727(a)(3), [the Second Circuit] has stated that whether a debtor's failure to keep books is justified is 'a question in each instance of reasonableness in the particular circumstances.'" *In re Cacioli*, 463 F.3d at 235. "It is a 'loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved.'" *Id.* (quoting *Morris Plan Indus. Bank of N.Y. v. Dreher*, 144 F.2d 60, 61 (2d Cir. 1944)).

The Plaintiffs have satisfied the elements for nondischargeability under Section 727(a)(3) based on Mr. Gormally's lack of records regarding his assets in Ireland. Mr. Gormally's amended schedules disclosed a 50% ownership interest in both Ballagh Properties and Gormally Investments, but valued those interests at zero. (PX 70 at 053). At the 341 Meeting, Mr. Gormally testified that through his interest in these companies, he owned several commercial properties that were leased in Ireland. (PX 80 at 9:13-11:24, 14:17-20, 18:13-19:4). But Mr. Gormally has provided little other information about these properties from the beginning of the bankruptcy case through trial in this adversary proceeding. He told the Chapter 7 Trustee that he was not aware of the amount of rent that came in on the properties. (PX 80 at 11:21-24, 14:17-15:8, 19:2-4). He also generally described the mortgage payments on the properties as not current and the properties as "distressed." (PX 80 at 12:1-14, 17:16-25). Given this lack of information, the Chapter 7 Trustee specifically directed Mr. Gormally at the conclusion of the 341 Meeting to provide her with additional information, including bank statements, mortgage statements, leases, deeds and other records that indicated who currently owned the properties and what rents or receivables the properties were generating. (PX 80 at 14:9-16, 19:5-15). Mr.

29

Gormally was therefore on notice from the beginning of the bankruptcy that these documents were necessary to determine his financial condition with respect to the bankruptcy filing.

But Mr. Gormally provided no testimony on the value of these assets in this adversary proceeding other than conclusory statements. For example, he testified at trial that he had valued his interest in Ballagh Properties at zero because the company's property was not producing any income and was over-mortgaged when compared to its value. (Trial Tr. 259:10-260:13, Jan. 16, 2015). Similarly, he testified that his valuation of Gormally Investments was zero because the property it owned was "in distress" and not worth what he owed. (Trial Tr. 262:21-263:21, Jan. 16, 2015). But Mr. Gormally failed to back up these blanket assertions with any information on the value of the properties. Mr. Gormally testified that he did not know the amount of money owed on the properties—other than vague estimates—or even the value of the properties. (Trial Tr. 260:6-261:9, 263:22-265:6, 278:23-279:7, Jan. 16, 2015). He also did not provide information about the amount of the rents charged for the Irish properties. (Trial Tr. 220:24-25, Dec. 3, 2014). He also did not know if his companies had any judgments against them. (Trial Tr. 218:13-15, Dec. 3, 2014).[16] Based on this testimony, it is hard to see any basis for his valuation.

Mr. Gormally also did not provide books or records at trial to demonstrate that he had satisfied his disclosure obligations about these Irish assets. He provided few books or records to help determine the value of his interest in Ballagh Properties or Gormally Investments, and none

---

[16] In the same vein, Mr. Gormally could not provide important information about his other assets, including the year that he disposed of Irish properties that he previously owned, nor could he provide clear testimony on his U.S. companies. (Trial Tr. 219:10-220:20, 221:19-222:14, Dec. 3, 2014). For example, as to a third Irish company in which he previously held an interest, Mr. Gormally could not clearly testify how much of an interest he had held or whether he had signed away these shares before or after filing for bankruptcy; he instead told the Plaintiffs' counsel to go look at the records. (Trial Tr. 249:18-251:20, 279:8-280:3, Jan. 18, 2015). Of course, information regarding prepetition transfers of property by a debtor is important in determining whether such transfers constituted a preference or a fraudulent conveyance under Sections 547 and 548, respectively.

of these related to the value of these assets at the time of his bankruptcy filing. (*See* Plaintiffs'
Proposed Findings of Fact ¶¶ 169, 175). This was true even though the Chapter 7 Trustee
requested such information during the 341 Meeting and the Court subsequently entered an order
directing the Debtor to "produce all documents responsive to plaintiffs' discovery demands
regarding assets in Ireland. . . ." [Adv. P. No. 13-08212, ECF No. 15].[17] "[This] failure to
produce records during discovery raises the inference that the debtor has failed to maintain
appropriate records. . . ." *In re Gray*, 2016 Bankr. LEXIS 804, at *10 (citing *Schackner v.
Breslin Realty Dev. Corp.*, 2012 WL 32624, at *5 (E.D.N.Y. Jan. 5, 2012) (noting that inference
may be rebutted by subsequently providing records); *Helms v. Gangemi (In re Gangemi)*, 291
B.R. 242, 246 (E.D.N.Y. 2003); *In re White*, 2015 WL 9274771, at *4 n.7).

Though the Debtor had previously produced annual statements for both Ballagh
Properties and Gormally Investments, none were provided past 2010. (PX 60; PX 63).[18] So
while Mr. Gormally testified at trial that the Ballagh property had a commercial tenant named
Xtra-Vision, (Trial Tr. 194:25-195:22, Dec. 3, 2014), and Gormally Investments had a
commercial tenant in The Square Inn, (Trial Tr. 189:9-10, Dec. 3, 2014; Trial Tr. 284:15-24, Jan.
16, 2015), no leases were provided at trial for either tenant. Nor were financial records produced
for the apartments maintained above Xtra-Vision. (PX 80 at 11:14-20). Mr. Gormally also did
not provide at trial any financial records for the single family house that he and his wife
apparently owned in Ireland. (Trial Tr. 214:20-215:3, Dec. 3, 2014). Nor did Mr. Gormally

---

[17]    During discovery, the Plaintiffs came before the Court "regarding [the] Defendant's failure to fully and
timely respond to [the] Plaintiff's discovery requests. . . ." [Adv. P. No. 13-08212, ECF No. 15]. The Court
therefore entered an order setting a deadline for the production of responsive documents regarding the Defendant's
Irish assets. [Adv. P. No. 13-08212, ECF No. 15].

[18]    In discovery, Mr. Gormally produced annual reports entitled "Report and Financial Statements for the Year
Ended December 31, 2010" for both Gormally Investments Limited and Ballagh Property Holdings Limited (PX 60;
PX 63).

provide at trial copies of leases, bank statements, mortgage statements or any other financial records with respect to the Irish companies in which he had an interest or the properties that they held.[19]  But statements and financial records of some kind clearly existed.  (*See, e.g.,* Trial Tr. 261:20-262:9, Jan. 16, 2015) (when questioned on whether he had asked his brothers for valuations of Ballagh Properties or its real estate holdings, Mr. Gormally responded, "We've got – we've got statements."); (*see also* Trial Tr. 263:1-3, Jan. 16, 2015).  Indeed, nothing provided at trial by Mr. Gormally to this Court shed any light on the financial condition of his Irish assets immediately prior to or at the time of his bankruptcy filing.[20]

Having failed to provide clearly relevant books and records as to the value of his interests in Ireland, the burden shifts to Mr. Gormally to justify their absence.  *See In re Cacioli*, 463 F.3d at 235; *In re Sandow*, 151 F.2d at 809 ("The statute puts the burden squarely upon the bankrupt who produces no financial records to produce at least a satisfactory explanation of their absence.").  Courts have examined the following factors in determining whether a debtor is justified in failing to produce adequate records for the type of business in which he was involved:

---

[19]    In fact, the only financial records presented by the Defendant at trial were: (1) a Deed of Mortgage and Charge, dated April 25, 2007, between Gormally Investments Limited and the Bank of Ireland, for the property known as The Square Inn, comprising the property in Folio 52687F County Galway (DX 1); (2) an undated Register of Ownership of Freehold Land by Gormally Investments Ltd. for Folio 52687F (DX 2); (3) a Deed of Mortgage and Charge, dated April 25, 2007, between Ballagh Property Holdings Limited and the Bank of Ireland for the premises at Vicar Street (DX 3); and (4) an Indenture of Conveyance, dated September 6, 2002, between Gerald Prendergst and Ballagh Property Holdings Ltd for the premises located at Vicar Street (otherwise the Square) in Tuam, Galway (DX 4).  None of these records show the value of the Defendant's Irish assets at the time of his filing for bankruptcy in 2013.  All other exhibits submitted at trial relating to the value of the Irish assets (indeed, all other exhibits presented in total) were submitted by the Plaintiffs.

[20]    After trial, the Chapter 7 Trustee issued a final report which found the estimated net value of the Debtor's interests in Ballagh Properties and Gormally Investments to be $10,000.00 each.  [Case No. 13-22109, ECF No. 115].  It has been stated that the issuance of a report of no distribution by a trustee may be relevant to whether a debtor provided sufficient documentation under Section 727(a)(3) of the Bankruptcy Code.  *See Berger & Assoc. v. Kran (In re Kran)*, 760 F.3d 206, 210-11 (2d Cir. 2014).  It is unknown whether the Debtor provided any additional documentation on these Irish assets to the Chapter 7 Trustee: the Defendant did not provide evidence on that issue, and neither side discussed this final report.  Thus, the Court can take little from the Chapter 7 Trustee's final report other than it found the Debtor's stake in these two Irish entities to collectively be worth $20,000.  The Court therefore makes its decision based on the evidence in the trial record.

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
2. The amount of the debtor's obligations;
3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
4. The debtor's education, business experience and sophistication;
5. The customary business practices for record keeping in the debtor's type of business;
6. The degree of accuracy disclosed by the debtor's existing books and records;
7. The extent of any egregious conduct on the debtor's part; and
8. The debtor's courtroom demeanor.

*See In re Cacioli*, 463 F.3d at 235 n.8 (citing *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000)); *see also In re Moreo*, 437 B.R. at 51 (citing to *Sethi* factors in determining whether debtor's failure to keep books was justified).

The balance of these factors easily weigh against granting a discharge to Mr. Gormally. With respect to the first factor, both Gormally Investments and Ballagh Properties were corporate entities of sufficient stature as to require the production of annual reports.  (PX 60; PX 63).  Indeed, Mr. Gormally testified numerous times about the existence of "statements" regarding the business ventures of Ballagh and Gormally Investments.  (Trial Tr. 261:20-262:9, 263:1-3, Jan. 16, 2015).  Thus, it is not unreasonable to assume that books and records could and should have been produced at trial.  *See Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436-37 (S.D.N.Y. 2004) ("When a debtor is engaged in business, he has a duty to maintain records in a manner consistent with what is normally expected of businesses of the same complexity. . . . While this does not necessarily mean that he was required to keep detailed records of his business income and expenses, the debtor was required to produce at least minimal records to allow his creditors to trace the Debtor's financial history for a reasonable period past to present.") (internal citations and quotations omitted).

The second and third factors also weigh against the Defendant.  While Mr. Gormally testified that he was not responsible for the day to day maintenance of Ballagh Properties and Gormally Investments, he failed to establish that he did not have access to records regarding the businesses.  Indeed, the weight of the evidence strongly suggested that he had such access.  To excuse his failure to provide records or information regarding these Irish assets, for example, Mr. Gormally asserted that an owner of a company under Irish law that is absent from the country must appoint directors to oversee that company, and that his brothers in Ireland were handling the day-to-day aspects of running the companies as directors.  (Trial Tr. 261:8-19, 284:25-285:4, Jan. 16, 2015).[21]  But Mr. Gormally never testified that he was unable to obtain business records for these companies.  One would reasonably assume that he could have easily contacted his brothers to obtain this information, but he admitted at trial that he made no attempt to do so. (Trial Tr. 262:10-13, 265:7-14, 265:20-24, Jan. 16, 2015).  He even noted that he and his brothers had "statements," but no such statements were produced.  (Trial Tr. 261:20-262:9, Jan. 16, 2015).  The most he offered at trial was the statement that he had only inquired with his brothers about annual statements for the companies "in the last week" in order to provide them to the Chapter 7 Trustee.  (Trial Tr. 262:14-20, 265:15-24, Jan. 16, 2015); *cf. Micro Connections, Inc. v. Shah (In re Shah)*, 388 B.R. 23, 37 (Bankr. E.D.N.Y. 2008) (citing *In re French*, 499 F.3d 345, 356 (4th Cir. 2007) (a debtor's delay in producing requested documents weighs in favor of denying the debtor's discharge under Section 727(a)(3))).  But no such additional documents were provided in this case.

---

[21]     Mr. Gormally stated that his wife was involved in running his Irish affairs.  (Trial Tr. 268:22-269:12, Jan. 16, 2015).  This only strengthens the conclusion that he had the ability to obtain records on these entities and simply chose not to do so.

With regard to the fourth factor, the Court was not presented with evidence of Mr.

Gormally's education.  But Mr. Gormally has extensive business experience.  In addition to his

past and present business interests in Ireland, he maintains at least two businesses in New York.

(PX 70 at 037).  And with respect to the fifth factor, the evidence establishes that the

maintenance of books and records was customary for both Ballagh Properties and Gormally

Investments, as both have issued annual reports prepared by accountants.  (PX 60; PX 63).  As

these reports explained:

> [t]he measures taken by the Directors to ensure compliance with the requirements
> of Section 202, Companies Act, 1990 regarding proper books of account are the
> implementation of necessary policies and procedures for recording transactions,
> the employment of competent accounting personnel with appropriate expertise
> and the provision of adequate resources to the financial function.  The books of
> account of the company are maintained at Hibernian Buildings, High Street,
> Tuam, Co. Galway.

(PX 60 at 005; PX 63 at 005).  The reports further provided that "[t]he Auditors, CAG Chartered

Accountants, will continue in office in accordance with section 160 of the Companies Act,

1963."  (PX 60 at 005; PX 63 at 005).  Thus, one can reasonably assume the continued

maintenance of books and records for these entities and their continued production of annual

reports.  Indeed, Mr. Gormally never claimed that annual reports had been discontinued for these

entities.  As to the sixth factor, the degree of accuracy disclosed by the debtor's existing books

and records is inapplicable in these circumstances because Mr. Gormally produced few books

and records, and nothing of recent vintage.

As to the seventh factor, the Court finds Mr. Gormally's conduct with respect to the

production of books and records to be egregious.  Simply put, he thought it was not his problem.

Instead, Mr. Gormally viewed it as the problem of his creditors.  Mr. Gormally stated that if the

Plaintiffs wanted to know the value of the properties owned by his companies, then they should

35

"look up my records" and that they would "have to get appraisal, look up appraisals." (Trial Tr. 260:16-261:8, 264:17-18. Jan. 16, 2015). Mr. Gormally even suggested at trial that the Plaintiffs contact his brothers or a solicitor in Ireland to get the information they are seeking. (Trial Tr. 261:14-19, Jan. 16, 2015).[22]

The Debtor's business records, of course, are documents that he was required to provide as part of his bankruptcy. "Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *O'Hara*, 2013 U.S. Dist. LEXIS 58167, at *21 (internal citations and quotations omitted). "[A] debtor cannot satisfy his burden of maintaining and producing adequate records by pointing the creditor to where records can be obtained from third parties." *Id.* at *23 (citing *Jacobowitz*, 309 B.R. at 438). "In determining whether the creditor has met his burden of proof, the determination is not whether the creditor 'could have obtained from other sources some or all of the records necessary to reconstruct the debtor's history. Instead, the question is whether the [creditor] demonstrated a prima facie case that debtor's financial history could not be constructed from the records provided by the debtor.'" *Id.* at *23-24 (quoting *Wazeter v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 229 (Bankr. W.D. Mich. 1997)).

As for the final factor, the Court finds that Mr. Gormally's courtroom demeanor weighs strongly against a discharge. Simply put, Mr. Gormally was not a credible witness at trial in claiming these Irish assets had no value. He was evasive and combative on the stand. Mr.

---

[22]    Mr. Gormally was not even able to testify as to what documents he had provided, instead making vague references to his having been ill at some point in the past and these matters having handled by his attorney and his wife. (Trial Tr. 197:4-198:11, 199:12-24, Dec. 3, 2014; Trial Tr. 248:5-249:11, Jan. 16, 2015).

Gormally's testimony began inauspiciously with his testimony that he would be unable to answer any questions based on documentary evidence because he had failed to bring his reading glasses. (Trial Tr. 151:13-152:13, Dec. 3, 2014). Once supplied with glasses by the Court, Mr. Gormally's testimony on his assets was woefully incomplete, oftentimes contradictory, bordering on purposeful obfuscation, and lacking in credibility. Mr. Gormally repeatedly demonstrated an inability to identify which of his companies—Ballagh Properties and Gormally Investments— owned which of two properties in Ireland. (Trial Tr. 201:5-203:25, Dec. 3, 2014). At certain points in the trial, he could not even clearly testify as to which companies in Ireland he even had an interest. (*Id.*; Trial Tr. 204:23-205:8, Dec. 3, 2014). Indeed, the Court expressed its frustration with Mr. Gormally several times at trial for his inconsistent answers with regard to his assets. (Trial Tr. 206:2-10, Dec. 3, 2014; Trial Tr. 252:15-21, Jan. 16, 2015). Mr. Gormally could not testify as to any specifics regarding these assets, instead stating that his brothers had handled all these finances. The Court finds it not credible that Mr. Gormally, who has run numerous businesses, would be so ignorant of the financial affairs of companies owned all or in part by himself and his wife.[23]

Mr. Gormally did not come forward with any credible explanation for his actions, merely summarily claiming that he "disclosed all of his assets to the Court through his Petition, Schedules, Amended Schedules and Testimony before the Chapter 7 Trustee at the Section 341 meeting." (Def. Proposed Conclusions of Law ¶ 20). But "[d]ebtors may not excuse the failure to maintain records by arguing that they simply did not keep records or by claiming that their records are sufficient." *Zemon v. Papadopoulos (In re Papadopoulos)*, 2015 Bankr. LEXIS 805, at *27-28 (Bankr. S.D.N.Y. Mar. 13, 2015). "The fundamental policy underlying § 727(a)(3) is

---

[23]    Mr. Gormally testified that the remaining 50% interest in Ballagh Properties was held by his wife, Bernadette Gormally. (Trial Tr. 252:3-10, Jan. 16, 2015).

to insure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *Ng v. Adler*, 518 B.R. 228, 241 (E.D.N.Y. 2014) (quoting *In re Sethi*, 250 B.R. at 837-38). "If a debtor fails to produce records, sufficient to meet the burden placed upon him by [Section] 727(a)(3), the Court must deny the discharge." *Ng*, 518 B.R. at 241 (quoting *In re Gangemi*, 291 B.R. at 246). As Mr. Gormally has failed to satisfy his obligations under the statute, the Court denies his discharge under Section 727(a)(3).

2. ***The Defendant's debts are also not dischargeable pursuant to Section 727(a)(4) of the Bankruptcy Code***

"'[T]o prove an objection to discharge under [Section] 727(a)(4)(A), the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Forest v. Bressler (In re Bressler)*, 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008) (quoting *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005)). "Once the plaintiff makes a *prima facie* showing that [the] debtor knowingly made a false oath, [the] debtor must come forward with a credible explanation for his actions." *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994). If a debtor is unable to provide this justification, a denial of discharge is appropriate. *See id.* (citing *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 316 (Bankr. E.D.N.Y. 1991)).

For purposes of Section 727(a)(4), "[a] debtor's petition and annexed schedules constitute a statement under oath." *In re Gannon*, 173 B.R. at 320. Additionally, a "statement" may be either an omission or an affirmative statement. *See Republic Credit Corp. v. Boyer (In re Boyer)*, 367 B.R. 34, 45 (Bankr. D. Conn. 2007). "'Because a debtor is unlikely to admit to having made

a deliberate misstatement, an objector may prove knowledge of falsity. . . by proving that the

debtor acted with at least a reckless disregard for the truth.'"   *In re Bressler*, 387 B.R. at 461

(quoting *Town of Skaneateles v. Scott (In re Scott)*, 233 B.R. 32, 44 (Bankr. N.D.N.Y. 1998));

*see also Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000);

*Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 618 (Bankr. N.D.N.Y. 2010).

　　　To establish the fraudulent intent element, a plaintiff must show "'actual, not constructive

fraud.'"   *In re Bressler*, 387 B.R. at 460 (quoting *In re Klutchko*, 338 B.R. at 567).   "'[R]eckless

indifference to the truth,'" however, also suffices to establish fraudulent intent for the purposes

of Section 727(a)(4).   *Id*.   "The required intent may be found by inference from all of the facts . .

. . [and] depends largely upon an assessment of the credibility and demeanor of the debtor."   *In

re Bressler*, 387 B.R. at 460-61 (internal citations and quotations omitted).   Additionally, "the

Second Circuit has recognized [that] fraudulent intent may be inferred from a series of incorrect

statements contained in the schedules."   *Castillo v. Casado (In re Casado)*, 187 B.R. 446, 450

(Bankr. E.D.N.Y. 1995).   To satisfy Section 727(a)(4), "[a] plaintiff must show that the omitted

information in the debtor's schedules occurred because the debtor exhibited a reckless

indifference for the truth or intended to mislead his creditors, not because of mere carelessness or

misunderstanding."   *Harris v. D'Amico (In re D'Amico)*, 2008 Bankr. LEXIS 2707, at *15

(Bankr. N.D.N.Y. Oct. 9, 2008).

　　　Finally, "[a]ny matter bearing on the discovery of estate property or debtor's business

dealings is material for purposes of" the provision.   *In re Gannon*, 173 B.R. at 319-20; *see also*

*In re Bressler*, 387 B.R. at 461 ("A statement or omission is material if it is related to the

debtor's business transactions, concerns the discovery of assets, business dealings, or the

existence or disposition of the debtor's property.") (internal citations and quotations omitted).

"[M]ateriality does not require a showing that the creditors were prejudiced by the false statement." *In re Murray*, 249 B.R. at 229 (internal citations omitted). "Omissions that do not affect the value of the estate may nevertheless be material if they hinder the trustee's or creditor's ability to investigate the debtor's pre-bankruptcy dealings and financial condition, even if such an investigation would not have benefitted creditors." *Gordon v. Tese-Milner (In re Gordon)*, 535 B.R. 531, 538 (S.D.N.Y. 2015).

The Court finds that Mr. Gormally made a false statement under oath. Specifically, Mr. Gormally indicated in his amended Schedule B that his 50% interest in Ballagh Properties and Gormally Investments was worth nothing. (PX 70 at 053, Line 13). But from all the evidence in this case, the Court must conclude that Mr. Gormally had no basis for his zero dollar valuation of these assets, and therefore he exhibited a reckless indifference to the truth. During trial, Mr. Gormally testified that he did not know either the value of the properties owned by Ballagh Properties or Gormally Investments, nor the amount of the mortgages owed on those properties. *See supra* at 30. He was also unaware of the amount of income being produced on those properties. *See id.* He produced no documentary evidence to support his general statements that the properties were distressed or not worth what was owed on them. (Trial Tr. 259:10-260:5, 262:21-263:21, Jan. 16, 2015). Clearly, signing an amended Schedule B stating that his Irish companies were worthless—without knowing the value of the assets owned by these companies—constituted reckless indifference to the truth of these statements. *See Dranichak v. Rosetti*, 493 B.R. 370, 379 (N.D.N.Y. 2013) ("'A mere 'glance over' merely corroborates the evidence that the debtors recklessly or willfully made a false oath within the meaning of 727(a)(4).'") (quoting *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003); *Wolf v. McChesney (In re McChesney)*, 2012 Bankr. LEXIS 2253, at *6 (Bankr. D. Md. May 18, 2012) (fraudulent

intent existed where debtor understated income and testified that "she did not pay close attention to her bankruptcy papers")); c*f. supra* note 20 (Chapter 7 Trustee concluding that Mr. Gormally's interests in Irish companies had value of $10,000 each).

The Court further finds the continued and systematic unwillingness of Mr. Gormally to accurately disclose his assets supports a finding of fraudulent intent. *See Dranichak*, 493 B.R. at 379 ("The reckless indifference standard applies when a pattern of conduct evinces an obvious pattern of deceit that flies in the face of the purpose of the Bankruptcy Code. Numerous omission may demonstrate such a pattern.") (internal citations omitted); *see also Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 69 (Bankr. N.D.N.Y. 2014) ("Fraudulent intent may be shown through circumstantial evidence or inferences from a course of conduct, all surrounding circumstances, and any evidence of a course of conduct.") (citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983)). Throughout his case, Mr. Gormally has held back information regarding his Irish assets. Information was disclosed in piecemeal fashion, only upon direct questioning by the Chapter 7 Trustee and then at trial only begrudgingly when confronted on cross-examination with evidence by the Plaintiffs.

This pattern started at the beginning of the bankruptcy case. Mr. Gormally made numerous inaccurate or incomplete statements about his assets and their value in his initial schedules. *See In re Casado*, 187 B.R. at 450 ("[F]raudulent intent may be inferred from a series of incorrect statements contained in the schedules."). The Defendant stated on his original Schedule B that he held no stock or interests in incorporated or unincorporated businesses. (PX 70 at 020, Line 13). He subsequently amended Schedule B to indicate a 50% interest in Ballagh Properties and Gormally Investments, but listed the value of his interest in those companies as zero. (PX 70 at 053, Line 13). The Defendant also filed a Schedule A that listed his ownership

41

of two pieces of real property located in Yonkers, New York, but did not refer to any properties

in Ireland.  (PX 70 at 006).  The Defendant's Statement of Financial Affairs listed his

involvement in two New York businesses, CMG Builders LLC and Vesey Renovations, Inc., but

none in Ireland.  (PX 70 at 037).[24]

       This lack of candor continued with the dearth of documents Mr. Gormally produced in

this adversary proceeding regarding his Irish assets.  This was the case despite being asked for

documents regarding these assets by the Chapter 7 Trustee, including bank statements, mortgage

statements, leases, deeds and other records that indicated who currently owned the properties and

what rents or receivables the properties were generating.  (PX 80 at 14:9-16, 19:5-15).  The

Plaintiffs here subsequently sought Court assistance to obtain essentially the same documents,

with the Court eventually entering an order requiring the production of all responsive documents

regarding the Defendant's Irish assets.  [Adv. P. No. 13-08212, ECF No. 15].  Despite this, Mr.

Gormally provided little information regarding his assets.  *See supra* at 30-32.

       The Defendant's reluctance to provide information continued with his testimony at trial,

during which he provided little specific information regarding his assets.  *See supra* at 30.

Moreover, the empirical evidence produced by the Plaintiffs at trial on the value of these Irish

assets confirms Mr. Gormally's reckless indifference to the truth.  This evidence shows that these

assets were operating businesses with potentially significant value.  With respect to The Square

Inn owned by Gormally Investments, for example, the Plaintiffs provided recent pictures of the

---

[24]     Indeed, the Chapter 7 Trustee expressed her frustration during the 341 Meeting regarding the lack of
information in the schedules, particularly as to these Irish assets.  (*See* PX 80 at 13:5-10) (Trustee stating "We
received everything yesterday.  Okay?  So we were supposed to get these a week ahead of time.  I have amendments
or a Schedule B, but none of them list property in Ireland.  So that needs to be added, whether you're treating it a
Schedule B or Schedule A property.  Okay?"); (PX 80 at 15:16-19) (Trustee: "The business in Ireland is not listed
on the Statement of Financial Affairs, question number 18, either, so that needs to be. . ."  Mr. Hamburg: "We'll
amend it, yes."); (PX 80 at 18:7-9) (Trustee noting that "petition doesn't have everything we need, I may have to
have you back so we can go through some of these."); (PX 80 at 19:7-9) (Trustee stating with respect to Irish
properties "[y]ou need to square that up with counsel so it's all listed on your bankruptcy petition.").

property from the internet that showed that property operating an active bar with self-catering/motel rooms.  (PX 48).  The Plaintiffs also provided a current real estate listing of the property from the internet, with an asking price of €300,000.  (PX 75).  Additionally, the Plaintiffs produced several photographs of the property owned by Ballagh Properties, referred to as The Square, in which the business Xtra-Vision operates.  (PX 87; PX 88; PX 89).  The few documents provided by the Defendant undercut his own zero valuation.  For example, the Defendant produced a document entitled "Indenture of Conveyance" of The Square to Ballagh Properties with a sale price of €512,752, and which also referenced the presence of a 35 year lease with a minimum annual fee of €19,998.37.  (DX 4 at 1, 3).  Further, the 2010 annual report for Gormally Investments valued the tangible fixed assets ("The Square Inn") at €626,263, and the tangible financial assets at €260,276.  (PX 60 at 011).  The 2010 annual report for Ballagh Properties valued the tangible fixed assets ("The Square") at €1,000,000.  (PX 63 at 011).[25]

Finally, Mr. Gormally's statements that these assets are worthless related materially to the bankruptcy case, since "[a]ny matter bearing on the discovery of estate property or debtor's business dealings is material for purposes of Section 727(a)(4)."  *In re Gannon*, 173 B.R. at 319-20; *see also In re Bressler*, 387 B.R. at 461 ("A statement or omission is material if it is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property.") (internal citations and quotations omitted).  "Virtually every imaginable asset becomes property of the estate upon the filing of a bankruptcy petition. . . . Lying about assets that are part of the estate—even if possibly exempt—certainly bears a relationship to the estate."  *In re Murray*, 249 B.R. at 230 (internal citations and

---

[25]    The Plaintiffs also produced a picture of the single family home on Birmingham Road, Tuam that Mr. Gormally testified was owned by himself and his wife.  (PX 99 at 021).  This single family home is not listed in any schedule filed by or on behalf of Mr. Gormally, although it appears to have later been identified at the 341 Meeting.  (PX 80 at 16:18-18:5).

quotations omitted).  As Mr. Gormally's Irish assets are property of the estate (*see* PX 80 at 19:5-9) ("All of these properties located in the United States or abroad are part of your bankruptcy estate.  Okay?  You need to square that up with counsel so it's all listed on your bankruptcy petition."), a false statement regarding their value therefore constitutes a material statement.

## CONCLUSION

For the reasons stated above, the Court finds that the Defendant did not commit fraud or breach his contract with the Plaintiffs, but did intentionally interfere with their prospective economic advantage resulting in damages of $60,000.00.[26]  Furthermore, the Court finds that the Defendant's debts are not dischargeable pursuant to Sections 727(a)(3) and 727(a)(4) of the Bankruptcy Code.[27]

Dated: New York, New York
     April 5, 2016

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE

---

[26]    The Plaintiffs have requested prejudgment interest, but do not provide legal support for its availability on their claim of intentional interference with prospective economic advantage.  (Plaintiffs' Conclusions of Law at 38). It appears that there is a basis under New York law for awarding prejudgment interest on this claim.  *See* N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."); *DeLong Corp. v. Morrison-Knudsen Co., Inc.*, 244 N.Y.S.2d 859, 864 (App. Div. 1st Dep't 1963) ("CPLR 5001(a) is phrased broadly and is designed to obliterate all distinctions that may turn on the form of the action (except as to actions of an equitable nature. . . .), the type of property involved, or the nature of the encroachment upon the plaintiff's property interests.  Thus, interest is available for the tortious interference with intangible, as well as tangible, property whether or not the property has been physically damaged.") (citing 5 Weinstein-Korn-Miller, N.Y. Civ. Prac. ¶ 5001.05); *Kassis v. Teachers' Ins. & Annuity Ass'n,* 786 N.Y.S.2d 473, 474 (App. Div. 1st Dep't 2004) (the "purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to received, taking into account the "time value" of money."); *cf. Stillman v. InService Am., Inc.*, 455 F. App'x 48, 51 (2d Cir. 2012) (awarding prejudgment interest for quantum meruit claim and stating that "a plaintiff who succeeds on a quasi-contract or implied-contract claim is entitled to pre-judgment interest under C.P.L.R. 5001(a)").

    As the parties have not briefed the issue, however, the Court will give them an opportunity to submit papers addressing whether prejudgment interest should be awarded in this case.  Such papers must be submitted by each party within fourteen days of the entry of this Opinion.

[27]    The Court does not require the submission of a proposed judgment at this time given the unresolved issue of prejudgment interest.